UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

CYNTHIA L. BUTLER,                          )
                                            )
         Plaintiff,                         )
                                            )
     v.                                     )         CIVIL NO.  1:18cv59
                                            )
NANCY A. BERRYHILL, Acting                  )
Commissioner of Social Security,            )
                                            )
         Defendant.                         )

OPINION AND ORDER

This matter is before the court for judicial review of a final decision of the defendant

Commissioner of Social Security Administration denying Plaintiff's application for Disability

Insurance Benefits (DIB) and Supplemental Security Income (SSI), as provided for in the Social

Security Act.  Section 205(g) of the Act provides, inter alia, "[a]s part of his answer, the

[Commissioner] shall file a certified copy of the transcript of the record including the evidence

upon which the findings and decision complained of are based.  The court shall have the power

to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or

reversing the decision of the [Commissioner], with or without remanding the case for a

rehearing."  It also provides, "[t]he findings of the [Commissioner] as to any fact, if supported by

substantial evidence, shall be conclusive. . . ."  42 U.S.C. §405(g).

The law provides that an applicant for DIB or SSI must establish an "inability to engage

in any substantial gainful activity by reason of any medically determinable physical or mental

impairment which can be expected to last for a continuous period of no less than 12 months. . . ."

42 U.S.C. §416(i)(1); 42 U.S.C. §423(d)(1)(A).  A physical or mental impairment is "an

impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. §423(d)(3). It is not enough for a plaintiff to establish that an impairment exists. It must be shown that the impairment is severe enough to preclude the plaintiff from engaging in substantial gainful activity. *Gotshaw v. Ribicoff*, 307 F.2d 840 (7th Cir. 1962), cert. denied, 372 U.S. 945 (1963); *Garcia v. Califano*, 463 F.Supp. 1098 (N.D.Ill. 1979). It is well established that the burden of proving entitlement to disability insurance benefits is on the plaintiff. *See Jeralds v. Richardson*, 445 F.2d 36 (7th Cir. 1971); *Kutchman v. Cohen*, 425 F.2d 20 (7th Cir. 1970).

Given the foregoing framework, "[t]he question before [this court] is whether the record as a whole contains substantial evidence to support the [Commissioner's] findings." *Garfield v. Schweiker*, 732 F.2d 605, 607 (7th Cir. 1984) citing *Whitney v. Schweiker*, 695 F.2d 784, 786 (7th Cir. 1982); 42 U.S.C. §405(g). "Substantial evidence is defined as 'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rhoderick v. Heckler*, 737 F.2d 714, 715 (7th Cir. 1984) quoting *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1410, 1427 (1971); *see Allen v. Weinberger*, 552 F.2d 781, 784 (7th Cir. 1977). "If the record contains such support [it] must [be] affirmed, 42 U.S.C. §405(g), unless there has been an error of law." *Garfield*, *supra* at 607; *see also Schnoll v. Harris*, 636 F.2d 1146, 1150 (7th Cir. 1980).

In the present matter, after consideration of the entire record, the Administrative Law Judge ("ALJ") made the following findings:

1.  The claimant meets the insured status requirements of the Social Security Act through December 31, 2017.

2.     The claimant has not engaged in substantial gainful activity since September 25, 2014 (20 CFR 404.1571 *et seq*., and 416.971 *et seq.)*.

3.     The claimant has the following severe impairments: neuropathy; bilateral carpal tunnel syndrome; tremor; obesity; osteoarthritis in the bilateral knees; left medial and lateral meniscal tearing; left knee chrondromalacia; headaches; chronic kidney disease; renal insufficiency; poly-arthralgia; major depressive disorder; and generalized anxiety disorder (20 CFR 404.1520(c) and 416.920(c)).

4.     The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5.     After careful consideration of the entire record, the undersigned finds that the claimant has the physical residual functional capacity to perform sedentary work, as defined in 20 CFR 404.1567(a) and 416.967(a).  As to use of the bilateral upper and lower extremities, she can use them on an occasional basis to operate hand and foot controls, respectively.  She can use her bilateral upper extremities to handle, finger, and feel on a frequent basis.  As to postural changes, she can climb ramps and stairs, balance, stoop, and kneel on an occasional basis, but cannot crouch, crawl, or climb ladders, ropes, or scaffolds.  With respect to her work environment, she must avoid unprotected heights, moving mechanical parts, and the operation of a motor vehicle.  She can tolerate occasional exposure to humidity, wetness, and vibration.  The claimant retains the mental residual functional capacity to perform simple, routine and repetitive tasks that do not require a production-rate pace (e.g., assembly-line work).

6.     The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7.     The claimant was born on February 2, 1970 and was 44 years old, which is defined as a younger individual age 18-44, on the alleged disability onset date. The claimant subsequently changed age category to a younger individual age 45-49 (20 CFR 404.1563 and 416.963).

8.     The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9.     Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569(a), 416.969, and 416.969(a)).

11. The claimant has not been under a disability, as defined in the Social Security Act, from September 25, 2014, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

(Tr. 19- 31).

Based upon these findings, the ALJ determined that Plaintiff was not entitled to disability insurance benefits. The ALJ's decision became the final agency decision when the Appeals Council denied review. This appeal followed.

Plaintiff filed her opening brief on September 25, 2018. On November 8, 2018, the defendant filed a memorandum in support of the Commissioner's decision, to which Plaintiff replied on November 30, 2018. Upon full review of the record in this cause, this court is of the view that the ALJ's decision should be remanded.

A five step test has been established to determine whether a claimant is disabled. *See Singleton v. Bowen*, 841 F.2d 710, 711 (7th Cir. 1988); *Bowen v. Yuckert*, 107 S.Ct. 2287, 2290-91 (1987). The United States Court of Appeals for the Seventh Circuit has summarized that test as follows:

> The following steps are addressed in order: (1) Is the claimant presently unemployed? (2) Is the claimant's impairment "severe"? (3) Does the impairment meet or exceed one of a list of specific impairments? (4) Is the claimant unable to perform his or her former occupation? (5) Is the claimant unable to perform any other work within the economy? An affirmative answer leads either to the next step or, on steps 3 and 5, to a finding that the claimant is disabled. A negative answer at any point, other than step 3, stops the inquiry and leads to a determination that the claimant is not disabled.

*Nelson v. Bowen*, 855 F.2d 503, 504 n.2 (7th Cir. 1988); *Zalewski v. Heckler*, 760 F.2d 160, 162 n.2 (7th Cir. 1985); accord *Halvorsen v. Heckler*, 743 F.2d 1221 (7th Cir. 1984). From the nature of the ALJ's decision to deny benefits, it is clear that Step 5 was the determinative inquiry.

Plaintiff was born on February 2, 1970. (R. at 146) At the time of her filing date, she was 45 years old. *Id*. Plaintiff completed high school. *Id*. at 316. She has previously worked as an assembler and a department supervisor. *Id.*

On September 23, 2013, Plaintiff visited Karissa Kreider, FNP, due to complaints of worsening neuropathy. (R. at 404) Plaintiff reported the prescribed medication Neurontin caused her headaches. *Id*. Ms. Kreider switched Plaintiff's Neurontin prescription to Elavil. *Id.* at 405. She encouraged Plaintiff to exercise daily. *Id.* On April 3, 2014, Plaintiff received an ultrasound of her kidneys. (R. at 406) It revealed renal atrophy. *Id*.

On August 7, 2014, Plaintiff visited physician assistant Emily Rondot. (R. at 464) During this visit, Ms. Rondot noted Plaintiff's kidney function had decreased. *Id*. at 467. On March 19, 2015, Plaintiff reported to Dr. HM Bacchus for a physical consultative exam as mandated by the Social Security Administration. (R. at 607) After examination, Dr. Bacchus wrote, "...does have multiple health issues...appears to retain the physical functional capacity to perform light duties, mainly sit-down in nature, and traveling short distances among work stations." *Id*. at 609.

On March 31, 2015, Plaintiff visited neurologist Dr. Fen-Lei Chang due to episodes of tingling numbness extending from right leg and arm into right side of face. (R. at 684) She experienced impaired speech which lasted a few moments. *Id.* Upon examination, Dr. Chang noted Plaintiff used an abnormal gait with intact postural reflexes. *Id*. at 686. She had difficulty with tandem and her Romberg only reached borderline. *Id.* After examination, Dr. Chang

diagnosed Plaintiff with paresthesia and seizure disorder. *Id*. He ordered a MRI of the brain and an EEG. *Id*.

On April 13, 2015, Plaintiff received a MRI of her brain. (R. at 1714) The MRI revealed a subtle, ill-defined area abnormality and enhancement in the left frontal lobe. *Id*. It also revealed cerebrospinal fluid levels had increased since last CT in 2011. *Id*. On May 6, 2015, Plaintiff visited neurologist Dr. James Dozier due to shaking, numbness, and tingling in her arms and legs. (R. at 670) A MRI of Plaintiff's brain showed subtle, ill-defined area of signal abnormality with a component of enhancement in the left frontal lobe. *Id*. From the MRI, Dr. Dozier saw evidence of a possible arachnoid cyst. *Id*. Plaintiff explained she suffered tingling, memory loss, difficulty concentrating, and headaches. *Id*. at 671. After examination, Dr. Hozier discussed with Plaintiff the possibility of a epidermoid. *Id*. He ordered a MR spectroscopy for further investigation. *Id*.

On May 27, 2015, orthopedic physician Dr. David Connor performed a total knee replacement on Plaintiff. (R. at 711)

On June 1, 2015, Plaintiff reported to Parkview Emergency Room due to a fall. (R. at 735) Plaintiff suffered worsening right knee pain since the fall. *Id*. During examination, the hospital noted her right leg had redness, mild erythema, and warmth to touch. *Id*. at 738. The hospital did not write treatment, but diagnosed her with "fall" and right knee pain. *Id*. at 740.

On June 1, 2015, Plaintiff visited TherapyONE for physical therapy due to her osteoarthritis. (R. at 764) Between June 1, 2015 and July 22, 2015, Plaintiff had a total of seven visits. *Id*. at 764, 881-885.

On June 4, 2015, Plaintiff returned to neurologist Dr. James Dozier for a recheck on her shaking, numbness and tingling in her arms and legs. (R. at 748) After examination, Dr. Dozier

diagnosed Plaintiff with kidney disease. *Id*. at 1695. Plaintiff still suffered a brain lesion, and Dr. Dozier ordered another MRI. *Id*. at 749. The same day Dr. Dozier attempted a MR spectroscopy, but due to Plaintiff's weight he could not perform it. *Id*. at 782.

On October 1, 2015, Plaintiff visited neurosurgeon Dr. John Braca III due to a temporal arachnoid cyst and left-sided left frontal lesion. (R. at 888) Upon examination, Dr. Braca noted right cranial nerve VI palsy. *Id*. MRIs from April and August 2015 revealed left frontal lobe enhancement consistent with telangiectasia or developmental venous anomaly. *Id*. Plaintiff's arachnoid cyst had not changed in size or morphology over time. *Id*. at 888-889. Dr. Braca did not suspect the lesion to be a case of metastasis. *Id*. at 889.

On December 29, 2015, Plaintiff visited Dr. Fen-Lei Chang due to complaints of worsening headaches, deteriorating memory, and resting tremor of the right arm. (R. at 791) Upon examination, Dr. Chang noted intermittent rest/postural tremor of the right arm, abnormal gait, difficult tandem, and borderline Romberg. *Id.* at 793. Dr. Chang diagnosed Plaintiff with memory loss, epidermoid cyst of the brain, headache, and tremor. *Id*. at 794. He prescribed Wellbutrin and ordered a neuropsychology evaluation. *Id*. He also opined Plaintiff might need psychiatric and/or psychological help. *Id*.

On February 10, 2016, Plaintiff visited family practitioner Dr. Michael Rumple for a followup on her disabilities. (R. at 1258) Plaintiff suffered worsening depression symptoms and admitted to wanting to hurt herself. *Id.* She saw a "neuropsych" already, but she also requested to see a psychologist. *Id*. Dr. Rumple referred Plaintiff to a psychologist. *Id*. at 1259.

On March 3, 2016, Plaintiff reported to neurologist Dr. Fen-Lei Chang for a followup on the pain, weakness, and tremor of both hands. (R. at 1665) Upon examination, Dr. Chang noted

intermittent rest, postural tremor of the right arm, abnormal gait, difficulty with tandem, and borderline Romberg. *Id*. at 1667. He diagnosed Plaintiff with memory loss, pain in lumbar spine, paresthesia, tremor, and weakness of arm. *Id*. at 1668. Plaintiff admitted to having suicidal thoughts despite psychiatric treatment; however, she said she would not act it on it because "her daughter would be mad at her." *Id*. He ordered a EMG of both arms. *Id*.

On March 10, 2016, Plaintiff reported to Park Center for an initial psychological assessment. (R. at 1276) Plaintiff was found to be a moderate suicide risk. *Id*. She suffered suicidal ideation and had a plan for it: "bottle of pain medications and other medications." *Id*. at 1277. Plaintiff felt she could act on this plan very soon. *Id*. She reported memory loss. *Id*. at 1276. Upon examination, the clinic noted Plaintiff had poor judgment, minimal insight, depressed mood, and helplessness, hopelessness, and worthlessness in thought content. *Id*. at 1282. After examination, the clinic diagnosed her with major depressive disorder and generalized anxiety disorder. *Id*. at 1286. They devised a plan of counseling and medication management. *Id*. at 1285-1286. On March 10, 2016, Park Center filled out an Adult Needs and Strengths Assessment for Plaintiff. (R. at 1288) Plaintiff's lack of impulse control, independent living skills, suicide intent, suicide planning, and self-care issues interfered with functioning. *Id*. at 1289-1290. They found her depression, sleep problems, and her suicide risk to be dangerous and/ or disabling. *Id*. at 1289-1290.

On March 10, 2016, Park Center and Plaintiff developed a suicide safety plan. (R. at 1293) Plaintiff's triggers included arguing with her daughter, physical pain, lack of sleep, and her ongoing health issues. *Id*. She admitted there were medications she could use to commit suicide; however, her daughter monitored her medication usage. *Id*. When suicidal thoughts occurred,

Plaintiff would call the priority clinic, call her therapist, listen to music, call a friend, or play a game. *Id.*

On May 4, 2016, Plaintiff reported to psychiatrist Dr. Karen Lothamer due to suicidal ideation and "crazy stuff" in her head. (R. at 1310) Plaintiff felt depressed and worthless. *Id.* She didn't have any kind of energy, and she suffered anxiety and sleep issues, despite Wellbutrin usage. *Id.* Plaintiff had thoughts of overdosing on her pills, but her adult daughter now manages her medications. *Id.* Upon examination, Plaintiff presented with mood fluctuations, agitation, suicidal ideation and intent, self-mutilation, and memory impairment. *Id.* at 1311. Dr. Lothamer noted Plaintiff suffered a sullen mood, flat affect, monotone speech, depressed thoughts, no energy, and some suicidal ideation with no plan or intent. *Id.* Plaintiff had issues with following through with things. *Id.* Dr. Lothamer diagnosed Plaintiff with major depressive disorder and generalized anxiety disorder. *Id.* at 1312. She kept the same prescriptions of Wellbutrin and Zoloft. *Id.*

On May 25, 2016, neurologist Dr. James Dozier noted Plaintiff remained at the current neurological state as last visit. (R. at 1647) She still suffered headaches and hand numbness and jerking. *Id.* Dr. Dozier requested a followup with Plaintiff after she had her carpal tunnel release. *Id.*

On May 31, 2016, Park Center filled out an assessment of Plaintiff's mental health status. (R. at 1319) Plaintiff measured as a moderate suicide risk. She experienced anger and impulse issues. *Id.* Her neurologist had prescribed her Wellbutrin and Xanax after testing Plaintiff for memory impairment. *Id.* The clinic noted Plaintiff suffered symptoms consistent with severe major depressive disorder and generalized anxiety. *Id.* at 1320. They recommended both

medication management and therapy services. *Id.*

On August 1, 2016, Plaintiff returned to orthopedic physician assistant Nathan Hyde, PA, due to her left knee osteoarthritis. (R. at 1761) The pain characterized as a constant sharp pain, and it had worsened over time. *Id.* Upon examination, Mr. Hyde noted left knee effusion, moderate tenderness at the medial patella femoral, pain with forced flexion, and mild patella crepitation. *Id.* at 1762. Mr. Hyde diagnosed Plaintiff with left knee primary osteoarthritis, gave her a Kenalog injection to her left knee, and prescribed Ultram. *Id.* at 1762-1763.

On September 27, 2016, Plaintiff returned to psychiatrist Dr. Karen Lothamer due to her major depression and anxiety. (R. at 1302) Upon examination, Dr. Lothamer noted Plaintiff suffered a flat affect and depressed mood. *Id.* at 1304. She continued past diagnoses and medications. *Id.* at 1306.

On December 20, 2016, family medicine physician Dr. Michael Rumple filled out a statement of medical condition for determination of participation in the IMPACT program. (R. at 387) He wrote Plaintiff's limitations as the following: sit for a half-hour, stand for five minutes, walk 120 feet, push and or pull ten pounds, and bend limited to weight. *Id.* Plaintiff could not grasp things or bend at her knees. *Id.* He diagnosed her with osteoarthritis in her knees, stage three chronic kidney disease, and obesity. *Id.*

On February 17, 2017, Plaintiff appeared for a hearing in Fort Wayne, Indiana before ALJ Arman Rouf of the Fort Wayne, IN Office of Disability Adjudication and Review (ODAR). (R. at 249) Butler's attorney Jameson Young and vocational expert Sharon Ringenberg were also present. *Id.* at 62.

Before Plaintiff's health deteriorated in 2014, Plaintiff worked at Dollar General Partners

and Parker Hanifen. (R. at 70-72) She worked at Dollar General Partners for less than a year before changing to Parker Hanifen. *Id*. at 71. Plaintiff worked at Parker Hanifen from 2003 to 2012 as a general assembler. *Id*. at 71. Her employer promoted her to industrial brazer after eight years as a general assembler. *Id*. at 72. After she battled breast cancer, Plaintiff could no longer do the industrial brazer position and her employer demoted her to a general assembler. *Id*. She struggled to complete a few weeks as a general assembler because she couldn't grasp the parts due to her disabilities. *Id*. After a few weeks, Plaintiff and her employer came to a mutual decision for her to resign from the company. *Id*.

Six or seven months after the alleged onset date of September 25, 2014, Plaintiff had applied for janitorial work. (R. at 70) However, she never received the job for which she applied. *Id*. Plaintiff wanted to attempt work, but she admitted to ALJ Rouf she didn't think it possible to hold down a job. *Id*.

Plaintiff felt multiple things kept her from working such as dizziness, tremors, headaches, and "kidney issues." (R. at73) Plaintiff experienced dizziness five or six times intermittently a day, ranging from a couple of seconds to a couple of minutes. *Id*. To alleviate some of the symptoms, Plaintiff had to sit down and let the dizziness pass. *Id.* at 74. Nothing else helped her overcome the dizziness. *Id*. Treatment with a neurologist and neurosurgeon didn't prove very useful as no definitive cause of the dizziness and numbness emerged. *Id*. The doctors hypothesized that Plaintiff's brain lesion and brain cyst contributed to her symptoms. *Id*. Plaintiff's dizziness had worsened over time.*Id*. at 78.

Plaintiff also struggled with headaches "quite often." (R. at 74) The headaches ranged from a week to a month or more. *Id*. at 75. The over the counter medications Plaintiff took for the

headaches failed to work, and she struggled to find a doctor who would help her with the debilitating headaches. *Id*. Her family physician prescribed Mobic for the pain, but her kidney deterioration prevented her from taking the medication further. *Id.* at 77. During continued blood tests, Plaintiff's kidney numbers refused to come down. *Id*. at 79. Because of the inability to bring the numbers down, her family practitioner took her off many of her medications. *Id*. Her doctor diagnosed her with stage three kidney disease. *Id*. The kidney disease caused daily swelling and fluid retention to the point she couldn't get her feet into her shoes. *Id*. The fluid retention caused the skin around the bottom of her legs to crack open. *Id*. at 80. Lasix helped with the fluid retention and swelling, but it began to dry out her kidneys. *Id*. Her doctor adjusted with a lower dose water pill, which counterproductively resulted in lower kidney function. *Id*. at 81. The water pill, it caused her to go to the bathroom more frequently. *Id.* at 82. Other than the medication, her doctors suggested propping her feet up to help with the symptoms, which she does about eight hours every day. *Id*. She saw the kidney specialist frequently, attending appointments at least every two months. *Id.* at 94. In general, she had three to four doctor appointments a month for her disabilities. *Id*. at 102.

Plaintiff suffered tremors in both her arms and legs, but the shaking seemed to be moving up towards her face. (R. at 77) The left side of her body fared better than her right side. *Id.* at 78. The shaking happened daily, but the tremors occurred intermittently one to two times a week. *Id*. The tremors and shaking prevented her from controlling things.

Plaintiff also had received a right knee replacement. (R. at 83) Since her knee replacement, she needed a cane to help her ambulate. *Id.* at 99. Her doctors want to give her a left knee replacement due to osteoarthritis, but at the present, Plaintiff needed to lose some

weight and reduce the swelling before the procedure could be done. *Id*. at 83-84. The osteoarthritis caused her constant, excruciating pain, and her doctor attempted an arthroscopic surgery, but the procedure could not be completed due to muscle tears. *Id*. at 84. Plaintiff could not take medication for the pain due to her kidney disease. *Id*. at 85. She tried Oxycodone, but it gave her suicidal thoughts. *Id*.

Plaintiff also suffered degenerative disc disease. (R. at 87) Cervical discs five through seven were fused together, but Plaintiff still struggled through middle to lower back pain. *Id*. The pain occurred two to three times a week, and it prevented her from bending over, picking things up, and standing for long periods of time. *Id*. Plaintiff felt she could only lift about ten pounds, but not from the floor. The object had to be on a table in order for Plaintiff to lift the object. *Id*. at 93. She could sit for thirty minutes and only stand for five minutes. *Id*. Despite the use of her cane, the amount of walking Plaintiff could do measured to be about a parking lot before her legs began to shake and she became winded. *Id*. at 94, 99. Her cane assisted her when she needed to go from sitting to standing. *Id*. at 99.

Mentally, Plaintiff struggled through depression despite treatment by a psychiatrist and counselor. (R. at 88) At times, she contemplated suicide and believed it would be better if she weren't here. *Id*. at 88-89. Plaintiff suffered crying spells often, ruminating on who she was before her health deteriorated. *Id*. at 89. She also struggled with short term memory loss, attention, and concentration. *Id*. at 89-90. Plaintiff found following instructions and understanding information difficult. *Id*. at 91. She needed information to be repeated over and over again. *Id*. She also struggled with making decisions on her own and getting along with people. *Id*.

Due to her disabilities, Plaintiff required help with basic things. (R. at 96) Her daughter had to help Plaintiff with bathing by preparing sponge baths and using dry shampoo on Plaintiff's hair. *Id*. Her daughter needed to assist Plaintiff at the grocery store because Plaintiff could not do it on her own. *Id*. at 97. Plaintiff did not perform any of the household chores such as vacuuming, dusting, or doing laundry. *Id.* She needed to have other people help her take care of her dog, and her daughter managed her medications. *Id*. at 97-98, 100. Plaintiff's daughter had acquired power of attorney over Plaintiff. *Id.* at 100.

The hearing concluded with the examination of vocational expert Sharon Ringenberg. (R. at 103) Plaintiff's past work included air conditioner assembler and industrial brazer. *Id*. at 105. The ALJ posed hypothetical situations for an individual of Plaintiff's age, education, and past work history. *Id*. The ALJ posed the following:

> ...limited to sedentary work...limited to occasional operation of foot controls bilaterally. Limited to occasional operation of hand controls bilaterally. Limited to frequent handling, fingering, and feeling bilaterally. Limited to occasional climbing of ramps and stairs. No climbing of ladders, ropes, or scaffolds. Limited to occasional balancing, stooping and kneeling. No crouching or crawling. Must avoid unprotected heights, moving mechanical parts and operating a motor vehicle. Can tolerate occasional exposure to humidity, wetness and vibration. Limited to performing simple, routine and repetitive tasks but not as a production rate pace...

*Id*. at 105-106.

The ALJ held that Plaintiff could not work her past jobs. *Id*. at 106. However, the ALJ opined Plaintiff could work as a call out operator, an addresser, and mail sorter. *Id*. The ALJ further built upon the first hypothetical by adding the need for a cane for ambulation and standing. *Id.* According to the VE, this would eliminate employment. *Id*. at 107.

On July 26, 2017, the ALJ issued an unfavorable decision, concluding that Plaintiff's

impairments permitted the performance of other work. (R. at 13) At Step Two, the ALJ concluded the claimant suffered from the following severe impairments: neuropathy, bilateral carpal tunnel syndrome, tremor, obesity, osteoarthritis in the bilateral knees, left medial and lateral meniscal tearing, left knee chrondromalacia, headaches, chronic kidney disease, renal insufficiency, poly-arthralgia, major depressive disorder, and generalized anxiety disorder. *Id.* at 19. At the second half of Step Three, the ALJ established that Plaintiff could perform sedentary work with the following restrictions: occasionally operate hand and foot controls; frequently use her bilateral upper extremities to handle, finger, and feel; occasionally climb ramps and stairs, balance, stoop, and kneel; never crouch, crawl, or climb ladders, ropes, or scaffolds; avoid unprotected heights, moving mechanical parts, and operation of a motor vehicle; tolerate occasional exposure to humidity, wetness, and vibration; and can perform simple, routine and repetitive tasks without production rate pace. *Id.* at R. 21-22. At Step Four, the ALJ concluded the claimant could not perform past relevant work. *Id.* at R. 30. At Step Five, the ALJ found the claimant could perform the following occupations: call out operator, addresser, and mail sorter. *Id.* at. 31. Plaintiff's claim for benefits was denied upon this Step Five finding. *Id.* at R. 32.

In support of remand Plaintiff first argues that the ALJ's conclusion that Plaintiff can perform a significant number of jobs in the national economy is not supported by substantial evidence or the relevant legal standards. Specifically, Plaintiff argues that the ALJ's Step Five conclusion that Plaintiff could perform work as a call out operator, addresser, and mail sorter fails to have a basis in substantial evidence because the ALJ failed to consider evidence which indicated those positions could not be performed by someone with the limitations he assigned to Plaintiff, particularly her limitation to performing only "simple, repetitive tasks." (R. at 21-22)

15

While the burden of proof is on Plaintiff during steps one through four, at step five the burden shifts to the Commissioner requiring her to demonstrate that a claimant can perform a significant number of jobs in the national economy. *Clifford v. Apfel*, 227 F.3d 863, 868 (7th Cir. 2000). Plaintiff contends that the ALJ failed to meet this burden as he did not even address evidence which suggested the vocational expert's testimony was unreliable. Plaintiff argues that the evidence ignored by the ALJ demonstrates that the jobs the vocational expert testified Plaintiff could perform involve a higher skill level than the vocational expert's testimony reflected. Plaintiff also asserts that there is no indication that Plaintiff has the capacity to perform jobs at the skill level required, and the notion that she could is contradicted by the ALJ's limiting her to "simple, routine, repetitive tasks," or "unskilled" work. SSR 83-10.

Plaintiff's counsel submitted vocational evidence which contradicted the vocational expert's testimony that a hypothetical individual with Plaintiff's limitation to unskilled work could perform the jobs of call out operator, addresser, and mail sorter as they are currently performed in the national economy. R. at 364-385. The evidence submitted by Plaintiff's counsel in objecting to the vocational expert's testimony demonstrates that updated descriptions of the jobs the vocational expert testified someone with Plaintiff's limitations could perform now require a higher skill level, SVP 4.0 to SVP 6.0, than they did when the Dictionary of Occupational Titles codes, on which the vocational expert relied, were last updated in 1977. Plaintiff's counsel provided the ALJ with O*Net data reflecting the increase in skill level of the jobs at issue, as performed in today's economy. (R. at 364-385) Plaintiff points out that the Bureau of Labor Statistics, a federal government entity which the vocational witness testified she relies on calculating her estimates of jobs numbers, has replaced the Dictionary of Occupational

Titles with O*Net as its primary database for understanding the demands of particular jobs.

Plaintiff argues that the ALJ's failure to address this evidence indicates that the ALJ failed to bear his burden at Step Five. The Seventh Circuit Court of Appeals has already expressed significant skepticism about the kind of testimony offered by the vocational expert at Plaintiff's hearing and reliance on a 1977 description of the way jobs are performed or even whether they exist in the current economy. For example, in *Alaura v. Colvin*, 797 F.3d 503, 507-08 (7th Cir. 2015) the Court wrote:"We have recently expressed concern with the source and validity of the statistics that vocational experts trout out in social security disability hearings. . . . The problems appears to be that the only reliable statistics are census data for broad categories of jobs, rather than for jobs in narrower categories. . ." The Court specifically addressed the "Addresser" job: "And does anyone use a typewriter anymore? Most addressing nowadays is either personal, as when one is sending a get-well card, or automated as in the case of business mailings, including mass mailings of advertisements or magazines." Judge Posner's concurring opinion in *Hill v. Colvin*, 807 F.3d 862, 872 (7th Cir. 2015) is also instructive. He addressed jobs which didn't "sound like unskilled work." He wrote: "A call-out operator 'compiles credit information, such as status of credit accounts, personal references, and bank accounts to fulfill subscribers' requests, using telephone.' Sedentary yes, unskilled no".

Plaintiff argues that the question of the accuracy of the vocational experts testimony should have been adjudicated by the ALJ. Because the ALJ bears the burden of proof at Step Five, he may depend upon expert testimony only if the testimony is reliable. *McKinnie v. Barnhart*, 368 F.3d 907, 910 (7th Cir. 2003); *Donahue v. Barnhart*, 279 F.3d 441, 446 (7th Cir. 2002) ("Evidence is not 'substantial' if vital testimony has been conjured out of whole cloth."); *see*

*also Consol. Coal Co. v. Stein*, 294 F.3d 885, 893 (7th Cir. 2002) (parties to an administrative proceeding must satisfy the ALJ that their experts are qualified). A vocational expert is "free to give a bottom line," but the data and reasoning underlying that bottom line must be "available on demand" if the claimant challenges the foundation of the vocational expert's opinions. *Donahue*, 279 F.3d at 446. "If the basis of the vocational expert's conclusions is questioned at the hearing . . . then the ALJ should make an inquiry . . . to find out whether the purported expert's conclusions are reliable." *Brown v. Colvin*, 845 F.3d 247, 254-55 (7th Cir. 2016) (citing *Overman v. Astrue*, 546 F.3d 456, 462-63 (7th Cir. 2008)) (per curiam) (quoting SSR 00-4p, 2000 WL 1898704 (Dec. 4. 2000)). "The inadequacy of vocational expert testimony has been remarked in a number of decisions by this and other courts, and by informed commentators." *Herrmann v. Colvin*, 772 F.3d 1110, 1112-14 (7th Cir. 2014). Remand is appropriate when an ALJ leaves an "unresolved potential inconsistency in the evidence that should have been resolved." *Id.* at 736 (citations omitted).

In the present case, the ALJ perfunctorily and inaccurately concluded that "[d]espite the attorney's assertions that the three jobs provided were no longer performed in the manner described in the DOT and required greater skill level, he provided no evidence to support his assertions." R. at 32. As Plaintiff has demonstrated, the ALJ's conclusion is simply not true. The ALJ's failure to actually consider and evaluate the evidence submitted by Plaintiff's counsel in objection to the vocational witness's testimony fails to provide the requisite "logical and accurate bridge" between the evidence and his conclusion that Plaintiff could perform the jobs of call out operator, addresser, and mail sorter.

The Commissioner, in response, does not deny that the ALJ failed to address vocational

evidence which contradicted the testimony of the vocational expert, and mistakenly concluded that no such evidence was presented by Plaintiff's attorney. Rather than addressing the O*Net evidence submitted by Plaintiff, the ALJ, like the vocational expert, chose to simply rely on the D.O.T.'s 1977-1991 characterization of the jobs at issue.  As Plaintiff has noted, the Seventh Circuit has continually rejected the Social Security Administration's reliance on such outdated job descriptions and some of those rejections included intense skepticism of the D.O.T.'s portrayal of two of the jobs the ALJ ultimately found Plaintiff capable of performing.  The Commissioner has attempted to distinguish the instant case from *Alaura v. Colvin*, 797 F.3d 503, 507 – 08 (7th Cir. 2015) and *Hill v. Colvin*, 807 F.3d 862, 872 (7th Cir. 2015), arguing that the vocational expert, in the instant case, "explained that she reviews the results of the annual Occupational Employment Statistic Survey that the Bureau of Labor Statistics conducts." (Def's Br. at 5) This argument fails. The vocational expert testified that she reviewed the Survey in compiling the number of particular jobs which exist in the national economy, not that the Survey updated the skill levels required to perform those jobs. That a job title exists in significant numbers in 2017 does not mean that the job is performed the same way it was in 1977. Additionally, the Survey is conducted by the Bureau of Labor Statistics, a federal government entity which the Commissioner admits relies on O*Net, the exact source of the evidence submitted to the ALJ by Plaintiff's counsel, with regard to what skills particular jobs require. This court agrees with Plaintiff that the ALJ's failure to evaluate such significant and reliable evidence deprives his conclusion of a logical and accurate bridge to the vocational evidence contained in the record, just as the conclusions of the ALJs in *Alaura* and *Hill* were deprived of the support of substantial evidence. 797 F.3d at 507-508; and 807 F.3d at 872. Remand is warranted.

Next, Plaintiff argues that the ALJ further erred when he failed to adequately account for his own findings of moderate limitations in concentration, persistence, and pace in the assessed residual functional capacity and his Step Five hypothetical questions to the vocational expert. Because the Commissioner bears the burden of proof at Step Five, an ALJ is required to orient the witness to the totality of a claimant's limitations. "[B]oth the hypothetical posed to the VE and the ALJ's RFC assessment must incorporate all of the claimant's limitations supported by the medical record." *Yurt v. Colvin*, 758 F.3d 850, 857 (7th Cir. 2014); *O'Connor-Spinner v. Astrue*, 627 F.3d 614, 619 (7th Cir. 2010). With regard to the ALJ's findings of moderate limitations of concentration, persistence, or pace, specifically, the Seventh Circuit has held that "among the mental limitations that the VE must consider are deficiencies of concentration, persistence, or pace." *Yurt*, 758 F.3d at 857; *Stewart v. Astrue*, 561 F.3d 679, 684 (7th Cir. 2009) (hypothetical question "must account for documented limitations of 'concentration, persistence, or pace'"); *Varga v. Colvin*, 794 F.3d 809, 815-816 (7th Cir. 2015) (Holding that an ALJ's finding of limitations in "concentration, persistence, or pace" is finding of limitations in all three of those areas).

In *Varga v. Colvin*, the Seventh Circuit held that a hypothetical question limiting a person to simple, repetitive work with "few if any work place changes and no more than occasional interaction with coworkers or supervisors" did not even address moderate limitations in concentration, persistence, or pace, let alone adequately account for them. 794 F.3d 809, 814-815 (7th Cir. 2015). Further, the Court held that ALJ's limiting claimant to work "free of fast-paced production requirements" did not adequately address Plaintiff's limitations to the pace of his performance because the ALJ failed to define "fast-paced production." *Id.* at 815. Similarly, in the

present case, the ALJ did not actually provide for any limitations to Plaintiff's ability to sustain concentration throughout the work day in assessing the residual functional capacity and presenting hypothetical questions to the vocational expert. R. at 21-22. His limiting Plaintiff to "the capacity to perform simple, routine and repetitive tasks that do not require a production rate pace" is even more deficient than the limitations assessed by the adjudicator in *Varga*. The Seventh Circuit has long held that "simple, routine tasks" refer to unskilled work which indicates the amount of time an individual takes to learn a particular job, not how long they can sustain concentration without requiring a break or wondering off task. *Varga v. Colvin*, 794 F.3d at 814-816; *see also O'Connor-Spinner v. Astrue*, 627 F.3d at 620. Unskilled work is work which can be learned in 30 days or less or by simple demonstration. 20 C.F.R. § 404.1568. The Seventh Circuit has also continually held that an ALJ's limitation to the performance of simple, routine, repetitive tasks (unskilled work) does not at all account for moderate limitations in sustaining concentration for extended periods of time throughout the workday, but rather the skill level of the job and the amount of time it takes to learn a particular job in a training period, "whether work can be learned in this manner is unrelated to the question of whether an individual with mental impairments — e.g., with difficulties maintaining concentration, persistence, or pace — can perform such work. For this reason, we have repeatedly rejected the notion that a hypothetical like the one here 'confining the claimant to simple, routine tasks and limited interactions with others adequately captures temperamental deficiencies and limitations in concentration, persistence, and pace.'" *Varga*, 794 F.3d 814-815; citing *Yurt*, 758 F.3d at 858-59 (citing *Stewart v. Astrue*, 561 F.3d 679, 685 (7th 815*815 Cir.2009) (collecting cases)); *see also Craft v. Astrue*, 539 F.3d 668, 677-78 (7th Cir. 2008) (restricting claimant to unskilled, simple work does not

account for his difficulty with memory, concentration, and mood swings); *Young v. Barnhart*, 362 F.3d 995, 1004 (7th Cir. 2004).

Plaintiff further argues that the ALJ's residual functional capacity is made even more problematic by the fact the body of his decision explicitly reflects his belief that Plaintiff would wander off task, and yet, he failed to account for any time off task in the residual functional capacity and in the hypothetical questions he asked the vocational expert. In his decision, the ALJ wrote, "Nevertheless, due to her numerous physical health concerns and situational stressors, which would cause her to become somewhat distracted at work. Therefore, she is limited to simple, routine repetitive tasks that do not require a production rate pace." R at 30. This statement concedes Plaintiff would become "somewhat distracted at work." It is, therefore, only logical that she would be off task during periods of distraction. As Plaintiff correctly contends, this demonstrates the that ALJ committed the error the *Varga* Court identified. Social Security rules require that an ALJ must account for all of a claimant's limitations in assessing the residual functional capacity and presenting hypothetical questions to the vocational expert. SSR 96-8p. The ALJ's clear finding Plaintiff would experience time off task obligated him to account for time off task as part of his residual functional capacity and hypothetical questions to the vocational expert.

Unlike *Varga*, the ALJ's finding of moderate limitations of concentration, persistence, or pace was not based on any state agency opinion as the ALJ apparently departed from the opinions of the state agency consultants who appear to have not assessed any severe mental impairments. R. at 145-189. This distinction does not change the fact that a limitation to unskilled work, work which can be learned in 30 days or less, does not address daily limitations in sustaining

concentration for extended periods of time, or that the ALJ failed to account for time off task he clearly found Plaintiff would experience. The ALJ also failed to apprise the vocational expert of all of Plaintiff's limitations as required. SSR 96-8p. As a result, the ALJ relied on uninformed testimony by the vocational expert and failed to bear his burden of demonstrating "other jobs" Plaintiff could perform at Step Five.

In response, the Commissioner concedes that a limitation to unskilled work does not adequately account for a moderate limitation to the ability to sustain concentration. However, the Commissioner argues that the ALJ's limiting Plaintiff to work which does not require a "production-rate pace (e.g. assembly line work)" adequately communicated to the vocational expert how often she would be off task during the workday. This argument fails because the ALJ clearly opined that Plaintiff would wander off task at times but did not provide the vocational expert with any indication of how often or for how long. Clearly, remand is necessary so the ALJ may elicit testimony from a vocational expert which pertains to an individual with all of Plaintiff's limitations.

<u>Conclusion</u>

On the basis of the foregoing, the decision of the ALJ is hereby REMANDED for further proceedings consistent with this Opinion .

Entered: February 4, 2019.

s/ William C.  Lee
William C. Lee, Judge
United States District Court